UNITED STATES of America,

v.

Richard Patrick McGRATH,
a/k/a Patricia McGrath.

No. 99–554.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 2000.

---

Thomas Zaleski, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Anne Dixon, Philadelphia, PA, for Richard Patrick McGrath.

### ORDER AND MEMORANDUM
### ORDER

DuBOIS, District Judge.

**AND NOW,** to wit, this 7th day of February, 2000, upon consideration of the Motion for Suppression of Evidence (Doc. No. 10, filed October 26, 1999) filed by defendant Richard Patrick McGrath, a/k/a Patricia McGrath; the Government's Opposition to the Defendant's Motion (Doc. No. 17, filed November 5, 1999); and following a Hearing and Oral Argument on November 17 & 18, 1999; **IT IS ORDERED,** for the reasons set forth in the accompanying Memorandum, that defendant's Motion for Suppression of Evidence is **DENIED.**

### MEMORANDUM

## I. INTRODUCTION

Richard Patrick McGrath ("defendant"), a/k/a Patricia McGrath, has been charged in a multiple count indictment with two counts of armed bank robbery in violation of 18 U.S.C. § 2113(d), and five counts of using or carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The bank robberies took place on January 7, 1999 and July 14, 1999. The pending Motion for Suppression of Evidence involves events that occurred in connection with the alleged bank robbery of July 14, 1999. Specifically, defendant seeks to suppress evidence recov-

ered during the stop of her vehicle by officers of the Bensalem Township Police Department ("BTPD") on July 14, 1999.

Defendant argues that while the investigatory stop of her vehicle that day may have been initially lawful, police conduct that occurred moments after the stop escalated the event into a *de facto* arrest which was not justified by probable cause. Accordingly, defendant claims that all evidence obtained from a subsequent search of her car pursuant to a state issued search warrant was derivative of the unlawful arrest and should be suppressed as tainted "fruit of the poisonous tree."[1] Additionally, defendant argues that a positive identification made by an eyewitness to the bank robbery during a showup at the scene of the car stop should be suppressed on the ground that it, too, was tainted fruit derived from her unlawful arrest. Defendant further challenges the showup on the ground that it was conduct by BTPD in an unduly suggestive manner.

The Court concludes that the investigative car stop and the subsequent warrantless arrest in this case were lawful. The Court also finds that the showup identification process was not unduly suggestive. Therefore, as set forth below, neither the physical evidence seized during the execution of the warrant to search defendant's car, nor the positive identification made at the showup, will be suppressed.

## II. FACTS

On July 14, 1999, at approximately 9:06 a.m., BTPD was notified that the First Federal Savings & Loan Association of Bucks County ("First Federal"), located at Hulmeville and Galloway Roads in Bensa-

---

1. The defendant's car was searched pursuant to a state warrant obtained through a Bucks County magistrate. In addition to that warrant, three federal warrants were subsequently obtained and executed: (1) for items held by the management of a motel at which the defendant had stayed; (2) for the contents of a storage locker rented by the defendant; and (3) for the contents of a safety deposit box rented by the defendant.

In her Motion for Suppression of Evidence, the defendant challenges only the evidence seized as a result of the execution of the Bucks County search warrant. This position is based on defendant's stated understanding that the government will not seek to introduce in evidence any items seized pursuant to the federal warrants. Because only the validity of the Bucks County warrant is at issue, the federal warrants will not be addressed in this Memorandum and Order.

lem, Pennsylvania, had just been robbed at gunpoint. *See* Hearing Transcript (Nov. 17, 1999) ("HT–1"), at 24–25; *see also* Text of BTPD Radio Transmissions (July 14, 1999) ("RT"). Officer Glenn Vandegrift of BTPD was among the first officers to respond to the radio alert tone. As he was getting into his marked patrol vehicle, Officer Vandegrift heard the suspect in the bank robbery described over his police radio as "wearing an orange scarf" and as being a "very pale white male." HT–1, at 26; RT, at 9:07. Officer Vandegrift also heard the following over his police radio at that time: that shots had been fired during the bank robbery; that eyewitnesses believed the suspect to be the same person who had robbed that same First Federal branch in January, 1999; that the suspect had fled the scene with approximately $3,000 in stolen U.S. currency; that the suspect was driving a tan Cadillac with a New York license plate on or near Galloway Road; and that BTPD officers were already in pursuit of a possible suspect or suspects. *See* HT–1, at 26–27; RT, at 9:07.

Within several minutes of responding, Officer Vandegrift arrived at the intersection of Knights Road and Galloway Road on his way to First Federal. While there, he noticed a tan Lincoln Town Car ("tan Lincoln") traveling north on Galloway, away from First Federal, followed by two marked patrol vehicles. The tan Lincoln was operated by defendant; there were no passengers in the car. Officer Vandegrift became suspicious and decided to drive behind the second patrol vehicle in pursuit of the tan Lincoln. *See* HT–1, at 26–28. Shortly after doing this, one of the other officers in pursuit drove his patrol vehicle beside the tan Lincoln in order to identify the driver. Based on that officer's observation, a decision was made not to stop the tan Lincoln. Instead, Officer Vandegrift was instructed over police radio to "disregard the tan Lincoln, because there was a white female driving … that did not

match the description [of the suspect]." HT–1, at 28; RT, at 9:09. At that point, Officer Vandegrift turned his vehicle around and started to drive to First Federal because he had been informed that police had still not arrived at the scene of the crime. *See* HT–1, at 28.

Officer Vandegrift had traveled a short distance toward First Federal when he received updated information over police radio that a teller at the bank had reported that the suspect's getaway car might have been either a "beige, brown or gray" Cadillac or Lincoln, and that the amount stolen may have been as much as $5,500. RT, at 9:10–9:11. Also, another police officer who had investigated the previous robbery of the same First Federal branch in January, 1999 stated over the radio that "they were unclear of the last person that robbed that bank, whether it was a male or a female." HT–1, at 29–30. Based on this new information, Officer's Vandegrift's suspicions about the tan Lincoln with the female driver that he had seen only minutes earlier were rekindled, and he decided to try to find the tan Lincoln.

Officer Vandegrift found the tan Lincoln driven by defendant a short time later; it was stopped in traffic at the site of construction on Hulmeville Road. When Officer Vandegrift approached the vehicle, he observed that the driver was female with a very pale complexion and that the car had an Illinois license plate, which contains dark lettering on a white background, similar to New York license plates. *See* HT–1, at 28–33. After notifying police radio that he was behind the tan Lincoln, and noting that another marked patrol vehicle had arrived to provide support, Officer Vandegrift decided to initiate a "felony traffic stop;"[2] he turned his flashing lights and siren on and proceeded to the tan Lincoln. *See* HT–1, at 34; RT, at 9:11. The time was approximately 9:11 a.m.

At first, defendant appeared to yield to the lights and siren from Officer Vandegrift's vehicle-defendant started to drive

---

**2.** The parties agreed that a "felony traffic stop" was the same as a *Terry*-stop. *See*

Hearing Transcript (November 19, 1999) ("HT–2"), at 33.

onto the shoulder of the road. Then, as Officer Vandegrift was stopping his patrol vehicle directly behind the tan Lincoln, defendant started to drive back onto the main road in what Officer Vandegrift thought was an effort to evade the police. *See* HT–1, at 38. By that point, however, an escape was impossible because defendant was boxed-in on all sides: by Officer Vandegrift's police car from behind, by a blue pickup truck which had also yielded to the lights and siren from the front, by a large gully to the right, and by the other police car to the left. *See* HT–1, at 37–38.

Once it appeared that defendant was unable to flee in any direction, Officer Vandegrift and the other officer exited their police vehicles with their guns drawn. Both officers then ordered defendant to show her hands by putting them on the steering wheel, and defendant complied. Next, the officers approached the tan Lincoln on foot. They heard defendant repeatedly stating: "I'm a 65 year old woman. Why are you doing this to me? I didn't do anything wrong." HT–1, at 39–40. At that point, the officers ordered defendant to physically step outside of her vehicle; they did so "at least fifteen times," but defendant refused to comply. *See* HT–1, at 41. Eventually, the officers were close enough to defendant that they reached inside the tan Lincoln and, despite some slight resistance, were able to physically remove defendant from the driver's seat.

The officers placed defendant face-down on the ground in an effort to subdue her. *See* HT–1, at 43. As they did this, a red-hair wig fell off defendant's head. Also, as Officer Vandegrift was trying to grab defendant's left arm to place it behind her back, he noticed an empty brown leather gun holster on defendant's right hip. *See* HT–1, at 43. Defendant was finally handcuffed, patted down for weapons and placed in a locked patrol vehicle. *See* HT–1, at 44. At that point, the officers proceeded to investigate.

With defendant locked in a patrol vehicle, Officer Vandegrift walked up to the passenger's side of the tan Lincoln and looked through its window. *See* HT–1, at 44–45. From that vantage point he observed a blue and white striped shirt lying on the front seat wrapped around a large amount of U.S. currency. He also noticed other clothing items and personal effects strewn on the front floor and in the back of the vehicle. *See* HT–1, at 44–45. Despite these observations, neither Officer Vandegrift nor the other officer on the scene searched the tan Lincoln at that time.

Meanwhile, as the foregoing was taking place, Sergeant Kenneth Dowd of BTPD had arrived at First Federal and begun investigating the scene of the crime. Upon his arrival, Sergeant Dowd heard reported over police radio that officers had stopped a car matching the description of the one used in the robbery. *See* HT–1, at 83. Accordingly, Sergeant Dowd asked for someone at First Federal who could accompany him to the scene of the car stop and possibly identify the suspect being detained as "either being or not being the bank robber." *See* HT–1, at 98, 82–84. Michelle Raynor, a teller who worked at First Federal, overheard Sergeant Dowd and agreed to go to the scene to provide a possible identification.

Raynor had been an eyewitness to two robberies at First Federal—one on January 7, 1999 and the other on July 14, 1999. On both occasions Raynor's teller window had been directly involved in the bank robbery. As a result, she had had several opportunities each time to view the robber at close distance—during the January robbery she observed the robber twice from across her window, approximately two feet away, for about fifteen to twenty seconds each time; and during the July robbery she again saw the robber twice from close range, first as the robber stood at her window for about twenty seconds in the course of robbing her, then after the robber returned from taking money from the vault and stood near her window for another twenty to thirty seconds. *See* HT–1, at 96–97; 106–07.

Sergeant Dowd drove Raynor from the bank to the scene of the car stop, where defendant was being detained for the showup. The trip lasted between five and ten minutes. *See* HT–1, at 85–87. During the car ride, Sergeant Dowd told Raynor that "officers had stopped the car which fit the description given" and that "the suspect was there and . . . she could view the suspect without the suspect viewing her." *See* HT–1, at 84, 98.

Once Sergeant Dowd and Raynor arrived for the showup they were met by several other BTPD officers. Sergeant Dowd pulled directly behind another marked patrol vehicle and exited his car to confer with the other officers. At that time, Sergeant Dowd was informed that there would be some delay in conducting the showup because the officers on the scene were unsure whether or not defendant should be displayed to Raynor wearing the red-hair wig that had fallen off her head earlier. A call had already been placed to the district attorney's office regarding this issue. *See* HT–1, at 90. Meanwhile, as everyone awaited the district attorney's advice, Raynor remained seated inside Sergeant Dowd's vehicle for approximately forty minutes. *See* HT–1, at 99.

As Raynor waited inside the vehicle, Sergeant Dowd and another officer periodically approached her to make sure she was all right. Raynor was told that the officers were "waiting for a detective to come to the intersection in order for [Raynor] to make a positive identification of the suspect." *See* HT–1, at 99. At one point, Raynor asked "where the suspect was," but was informed that they could not tell her at that time. *See* HT–1, at 99–100.

Eventually, Detective James Connor of BTPD approached Raynor, sat down beside her on the front seat, and told her that they "would be taking a person out of the car in front of her," and that she should "look at that person and tell [Detective Connor] whether or not that person was the one who had robbed the bank." *See* HT–1, at 91.

Detective Connor then signaled to Officer Vandegrift to take defendant out of the police vehicle which was parked directly in front of the vehicle in which Raynor was seated, about twenty feet away. *See* HT–1, at 47. Defendant was removed from the rear left hand side of the vehicle, facing away so as to provide Raynor with a left profile view. Next, defendant was turned to face forward toward where Raynor was seated. At that time, defendant was handcuffed behind her back and she was not wearing the red-hair wig. *See* HT–1, at 47; 90–93; 100.

Upon viewing the suspect before her, Raynor was at first "surprised." HT–1, at 100. However, as soon as defendant raised her head, Raynor "realized that it was the person who had robbed the bank." *See* HT–1, at 100; 92–93. Raynor told Sergeant Dowd that although the robber on July 14, 1999 was wearing sunglasses, a baseball hat and covering from the tip of the nose down, she recognized the robber as the same person who committed the January 7, 1999 robbery because of the individual's pale skin complexion and mode of attire. She immediately identified the individual involved in the July 14, 1999 robbery as the same person who had robbed First Federal on January 7, 1999. *See* HT–1, at 96–98; 102–03. Based on this positive identification, defendant was placed under arrest[3] for robbing the First

---

**3.** The Court notes that the government has vacillated with respect to the precise moment when defendant was "placed under arrest." At first, the government's position was that defendant was not arrested until after the positive identification was obtained at the showup. *See* HT–1, at 48. Subsequently, the government changed it's position, arguing that defendant was placed under arrest "ap-

proximately 20 minutes" after being locked in the patrol vehicle. *See* HT–2, at 44.

The Court need not resolve this ambiguity concerning the precise moment of defendant's arrest. The issue is not pivotal to the Court's analysis because, as is discussed later in this Memorandum, the Court concludes that defendant was lawfully under investigative detention pursuant to a valid *Terry*-stop up until

Federal. *See* HT–1, at 47–48. However, the tan Lincoln was not searched at that time. Instead, it was impounded and taken to a secure sally port at BTPD headquarters. *See* HT–1, at 49–50.

Later that same day, BTPD officers obtained a search warrant from a Bucks County Magistrate authorizing a search of the tan Lincoln. During the subsequent search of that vehicle, Officer Vandegrift and several other BTPD detectives recovered numerous items, including: a blue and white striped shirt; an orange shirt; a pair of sunglasses; $10,125 in various denominations of U.S. currency; and a Smith & Wesson .38 caliber six shot revolver, with five rounds in the cylinder—only three of the rounds in the gun were live, and two were spent casings. *See* BTPD, "Search Inventory List."

## III. DISCUSSION

In connection with her Motion for Suppression of Evidence, defendant makes several arguments. First, the defendant claims that while her vehicle may have been lawfully stopped, police conduct during the car stop transformed the investigatory detention into a *de facto* arrest that was without probable cause. Therefore, she contends that any evidence obtained after the point in time when she was unlawfully placed under *de facto* arrest is tainted and should be suppressed as "fruit of the poisonous tree." Next, defendant argues for the suppression of the positive identification made by Raynor, an eyewitness to the bank robbery, on the ground that certain statements and conduct by BTPD during the showup were unduly suggestive. Finally, defendant contends that because this unduly suggestive identification was relied upon by the police in obtaining the warrant to search her tan Lincoln, that warrant is further tainted.

In response to defendant's contentions, the government argues that the defendant's tan Lincoln was properly stopped pursuant to *Terry v. Ohio* and, further, that defendant was thereafter placed in

the time the showup was conducted. conduct-

lawful investigatory detention. Next, the government denies that any police conduct during this period of detention transformed the stop into a *de facto* arrest. Rather, the government posits that while defendant was being detained, BTPD officers on the scene acquired additional information which ripened the reasonable suspicion which initially justified the stop into probable cause for an arrest. Finally, with respect to the showup, the government contends that it was neither unduly suggestive nor an improper exploitation of an unlawful arrest.

In light of the foregoing arguments, the Court will begin its analysis by examining the validity of the investigatory *Terry*-stop of defendant's car. In connection with that analysis, the Court will review the police conduct during the stop to determine whether at any point it exceeded the scope of a lawful *Terry*-stop and thereby escalated into a *de facto* custodial arrest. Next, the Court will address the issue of probable cause, because in order for the defendant's warrantless arrest to have been valid, the Court must be satisfied that BTPD officers had the requisite probable cause when defendant was placed under arrest. Further, the Court will review the showup that was conducted in order to determine whether or not it was unduly suggestive in any way. Finally, the Court will briefly address the validity of the Bucks County warrant pursuant to which defendant's tan Lincoln was searched.

### A. The "Terry-stop"

The Court must consider three issues with respect to the *Terry*-stop conducted by BTPD officers: (1) whether the officers had the requisite reasonable suspicion to justify the stop in the first place; (2) whether the alleged use of force by the BTPD officers escalated the stop from investigatory detention into a *de facto* custodial arrest; and (3) whether the duration of the defendant's detention during the

ed. conducted.

stop was excessive and thereby transformed it into a *de facto* custodial arrest.

### 1. Reasonable Suspicion

█ Pursuant to the rule announced in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop an individual and initiate a brief investigatory detention if the individual's behavior raises suspicion of criminal activity. *See id.* at 22–24, 88 S.Ct. 1868. However, the officer's suspicion must be based upon specific and articulable facts which, taken together with the rational inferences from those facts, reasonably imply that a crime has been committed or that some criminal activity is afoot. *See id.,* at 30, 88 S.Ct. 1868; *see also United States v. Rickus,* 737 F.2d 360, 365 (3rd Cir.1984). Applying this standard to the instant case, the Court finds that BTPD officers possessed the requisite reasonable suspicion to justify a *Terry*-stop of defendant's tan Lincoln on July 14, 1999.

Within a few minutes of responding to the radio alert tone for the bank robbery, Officer Vandegrift heard the following information broadcast over police radio: that the suspect was a very pale white male wearing an orange scarf; that shots had been fired during the bank robbery; that witnesses believed the suspect to be the same person who had robbed that First Federal branch in January, 1999; that the suspect had escaped with approximately $3,000 in cash; that the suspect had left the scene driving a tan Cadillac with a New York license plate; and that the suspect was presumed to be on or near Galloway Road with police vehicles in pursuit. Based on this information, Officer Vandegrift became suspicious when he initially came upon defendant's tan Lincoln at the intersection of Knights Road and Galloway Road. Yet, he and the other officers in pursuit did not stop defendant at that time because they observed that neither the car (i.e., not a Cadillac, but a Lincoln) nor the driver (i.e., not a pale white male, but a pale white female) nor the license plate (i.e., not a New York plate, but an Illinois plate) matched the information that had been initially broadcast.

Defendant was, however, stopped a short time later. By then Officer Vandegrift had received updated information over police radio. He had heard that the suspect in the First Federal bank robbery was believed to be driving either a tan Cadillac or a tan Lincoln. More importantly, he was informed that the suspect could be either male or female. The Court concludes that this new information, coupled with the encounter with defendant's tan Lincoln only a few minutes earlier, provided Officer Vandegrift, with a reasonable articulable suspicion that defendant was involved in the bank robbery. *See e.g., United States v. Harple,* 202 F.3d 194, 196 (3d Cir.1999) (affirming district court's finding of reasonable suspicion based, in part, on "temporal and geographic proximity" of defendant to scene of crime). Based on this reasonable suspicion, Officer Vandegrift began to search for the tan Lincoln.

When Officer Vandegrift eventually found the tan Lincoln, defendant's conduct further heightened the officer's existing reasonable suspicion. For example, although at first defendant appeared to be yielding to Officer Vandegrift's lights and sirens, she suddenly attempted to drive back onto the road in what Officer Vandegrift believed was an attempt to flee from the police. This conduct provided ample reasonable suspicion to justify the stop. Indeed, the Court is mindful that attempted flight from police, without more, could provide a lawful basis for reasonable suspicion under certain circumstances. *See Illinois v. Wardlow,* —— U.S. ——, ——, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (holding that unprovoked flight alone may be sufficient to support an officer's reasonable suspicion). Yet, in the instant case the Court need not rely only on the attempted flight because there were other factors in Officer Vandegrift's rapidly mounting reasonable suspicion calculus.

Defendant attempts to make much of the fact that defendant's car had an Illinois license plate, and that BTPD officers believed the suspect to be driving a vehicle with a New York license plate. However, a reasonable suspicion determination does not turn on one fact alone. Rather, it is to be judged under the totality of the circumstances. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *see also Harple,* 202 F.3d at 196. In the instant case, aside from the description of the license plate on defendant's vehicle, Officer Vandegrift had several other articulable facts upon which to base his reasonable suspicion. Moreover, there is evidence that Illinois license plates and New York license plates are similar in appearance—e.g., both contain dark lettering on a white background. The Court also takes judicial notice of the fact that both Illinois and New York license plates are notably distinct from Pennsylvania license plates, which typically contain light-colored lettering on a dark background, and which predominate in Bucks County. Thus, the Court finds it plausible that a witness at the bank robbery might have mistaken the Illinois license plate on defendant's car for a New York license plate and erroneously reported that to BTPD officers. It was not unreasonable for the police to recognize this possible mistake and to factor it into their reasonable suspicion calculus.

*2. Use of Force*

■ Although the police had reasonable suspicion to stop defendant's tan Lincoln on July 14, 1999, defendant challenges the investigatory stop of her vehicle on the grounds that the use of force during the stop transformed it into a *de facto* arrest, for which there was no probable cause. The Court finds this argument meritless.

An investigative *Terry*-stop may ripen into an arrest through the use of force. *See United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Houston v. Clark County Sheriff Deputy John Does 1-5* 174 F.3d 809, 814 (6th Cir.1999). When this occurs, the continued detention of a suspect must be based upon probable cause. However, although the manner of an investigative stop should be reasonably related to the basis for the initial intrusion, *see United States v. Palomino,* 100 F.3d 446, 449 (6th Cir. 1996), there is no bright-line test that distinguishes an investigative stop from a *de facto* arrest. *See Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Ultimately, it is the government's burden to demonstrate that any detention or seizure justified on the basis of reasonable suspicion was sufficiently limited in scope and manner to satisfy the conditions of an investigative stop. *See Royer,* 460 U.S. at 500, 103 S.Ct. 1319.

In the instant case, the police used force at two points during the investigative *Terry*-stop of defendant on July 14, 1999. First, Officer Vandegrift and the other officer on the scene exited their patrol vehicles and approached defendant's car with their guns drawn. However, in the context of an investigatory stop, police officers under a reasonable fear that a suspect is armed and dangerous may order the suspect out of a car and may draw their weapons when those steps are "reasonably" necessary for the protection of the officers. *See Sharpe,* 470 U.S. at 678, 105 S.Ct. 1568; *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993). The Court is satisfied that Officer Vandegrift and his fellow officer had been told, via police radio, that shots had been fired in connection with the bank robbery of First Federal. Accordingly, when the officers stopped defendant they had reason to believe that she might be armed and dangerous. Under those circumstances, it was reasonable for the officers to approach the tan Lincoln with guns drawn; that conduct did not constitute a *de facto* arrest.

Second, defendant contends that when the officers pulled her out of the car, placed her on the ground and handcuffed her, that use of force escalated the *Terry*-stop into a *de facto* arrest. The Court disagrees. An officer may use reasonable

physical force under the circumstances to effect a *Terry*-stop without converting the stop into an arrest. *See United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Terry*, 392 U.S. at 7, 88 S.Ct. 1868 (grabbing subject and spinning him around). So long as the circumstances warrant the precautions, such conduct, including the use of handcuffs, does not necessarily exceed the bounds of a *Terry*-stop. *See, e.g., Houston*, 174 F.3d at 814.

In the instant case, the precautions taken by BTPD officers at the scene of the *Terry*-stop were warranted by the surrounding circumstances. Not only were the officers investigating an armed bank robbery when they stopped defendant's vehicle, they had been informed that two shots were fired at First Federal. In addition, defendant appeared to be evading the police when they attempted to stop her car. Later, she refused to comply with the officer's commands to get out of her car despite being ordered to do so at least fifteen times. Taking all these factors into consideration, the Court concludes that pulling defendant out of her car, placing her on the ground to subdue her, and then handcuffing her were all reasonable steps taken for the sole purpose of protecting the officers' safety at the scene of the car stop. Therefore, this police conduct did not exceed the bounds of a valid *Terry*-stop.

### 3. Length of Detention

■ Finally, defendant challenges the investigative stop on the ground that the duration of defendant's detention during the stop exceeded the scope of a valid *Terry*-stop. Again, the Court fails to find any merit in defendant's position.

As with situations involving the use of force by police, discussed above, a *Terry*-stop may also ripen into an arrest through the passage of time. *See Sharpe*, 470 U.S. at 685–86, 105 S.Ct. 1568. However, the length of a lawful investigatory stop is not subject to a bright-line test—that is, there is no rigid time limit on such stops. *See Houston*, 174 F.3d at 815. Rather, "when an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." *Id.* The Supreme Court has emphasized "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Sharpe*, 470 U.S. at 685, 105 S.Ct. 1568. If the authorities are pursuing a diligent course of investigation "likely to confirm or dispel their suspicions quickly," courts "should not indulge in unrealistic second-guessing." *Id.* at 686, 105 S.Ct. 1568.

Applying this rule, investigatory stops lasting for over an hour have been upheld in connection with the further investigation of criminal activity, particularly armed bank robberies. *See United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir.1996) (upholding an investigatory stop lasting seventy five minutes, where police took diligent efforts to dispel their reasonable suspicion, including bringing a bank teller to the scene of the car stop for a showup); *see also Houston*, 174 F.3d at 815; *United States v. Gonzalez*, 864 F.Supp. 375, 386 (S.D.N.Y.1994).

The Court concludes that defendant was lawfully in detention for a reasonable period for the purpose of conducting further investigation of possible criminal activity by means of a showup, and that such detention did not escalate the *Terry*-stop into an arrest. This conclusion is based on the following: Defendant's tan Lincoln was initially stopped on Hulmeville Road at around 9:11 a.m. In the following few minutes, defendant was removed from the car, handcuffed and placed inside a locked patrol car. At that point, the officers radioed to BTPD headquarters that they had stopped a car matching the description of the one used in the First Federal bank robbery. Sergeant Dowd, who was working the crime scene at the First Federal, heard this broadcast report and within minutes he began to transport Michelle Raynor, an eyewitness to the bank robbery, from the bank to the car stop loca-

tion. This trip lasted no more than ten minutes. When Sergeant Dowd and Raynor arrived at the scene of the car stop there was a delay in conducting the showup. This delay lasted approximately forty minutes. Eventually, defendant was positively identified by Raynor and then immediately placed under arrest. Defendant was under investigatory detention incident to the *Terry*-stop for a period of approximately one hour before finally being arrested.

Moreover, the Court finds that after defendant was stopped by Officer Vandegrift and his fellow officer, the police discovered additional evidence linking defendant to the First Federal bank robbery. For example, as the officers were trying to subdue defendant for their own safety, Officer Vandegrift noticed that defendant was wearing an empty leather gun holster on her hip. At the same time, a red-hair wig fell from defendant's head, suggesting to the officers that defendant might be in disguise. Once defendant was placed in a locked patrol vehicle, Officer Vandegrift walked over to the tan Lincoln and observed several incriminating items through the window, including a large amount of U.S. currency wrapped in a shirt.

Therefore, rather than dispelling the initial suspicions that justified the investigative stop, the officers obtained a significant amount of additional information during the course of the *Terry*-stop that raised their initial suspicions about defendant's involvement in the First Federal bank robbery. As a result, the officers were warranted in conducting further investigation in order to either confirm or dispel their mounting suspicions. Such further investigation reasonably included a showup to determine whether an eyewitness to the bank robbery, which had occurred only a short while earlier, could positively identify defendant.

In connection with the showup, the Court is satisfied that there was no unreasonable delay on behalf of BTPD. For instance, Sergeant Dowd acted promptly in identifying Raynor as an eyewitness and then in bringing her to the scene of the car stop, which was only a short distance from the bank. Although there was some delay while the BTPD officers on the scene sought guidance from the district attorney's office on how to handle the issue of defendant's red-hair wig, that delay was justified by the somewhat unusual circumstances presented in this case-that is, by defendant's apparent modus operandi of dressing as both a male and female during bank robberies.

Thus, because Officer Vandegrift's initial suspicions about defendant were not dispelled during the *Terry*-stop, but were instead heightened, further detention of defendant for purposes of a showup was lawful and appropriate. The Court concludes that the showup was part of the ongoing investigative purpose of the *Terry*-stop, and defendant was detained no longer than was reasonably necessary in order to accomplish the initial investigatory objectives of the stop.

### B. Probable Cause and Arrest

■ Because the Court has concluded that defendant was not under arrest, but instead was placed in lawful investigatory detention, from the time her car was stopped until the time the showup was conducted, the Court need only concern itself next with whether the arresting officers had probable cause to arrest at the time defendant was placed under arrest—that is, after a positive identification was obtained from the showup. The Court concludes that probable cause to arrest did exist at that point in time.

It is well established that under certain circumstances police officers may lawfully arrest persons without an arrest warrant. *See Gerstein v. Pugh,* 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In particular, warrantless arrests are permitted for any felony that an officer has probable cause to believe the arrestee has committed. *See United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Probable cause is "defined in

terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein,* 420 U.S. at 111, 95 S.Ct. 854 (quoting *Beck v. State of Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)). Moreover, the Third Circuit has held that the "determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense [had been] committed." *Sharrar v. Felsing,* 128 F.3d 810, 817 (3d Cir.1997) (quoting *United States v. Glasser,* 750 F.2d 1197, 1206 (3d Cir.1984), *cert. denied,* 471 U.S. 1018, 105 S.Ct. 2025, 85 L.Ed.2d 306 (1985)). Thus, a court must look at the "totality of the circumstances" and use a "common sense" approach to the issue of probable cause. *Id.* at 1205 (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

In the instant case, the Court finds that there was ample evidence to warrant a reasonably prudent law enforcement officer to believe that defendant was involved in the First Federal bank robbery well before the moment defendant was actually placed under arrest. For example, when the arresting officers initially pulled defendant over, the tan Lincoln that defendant was operating matched the general description given by employees of the bank only minutes before. Defendant herself also matched the general description of the suspect that had been provided to BTPD. Furthermore, the police stopped defendant approximately one mile from First Federal, and when the officers repeatedly ordered defendant out of the vehicle, she did not comply with their commands. As a result, the officers were required to pull defendant out of the car. As they did this, they saw defendant wearing a gun holster on her right hip. Next, after the officers locked defendant in their patrol car, Officer Vandegrift walked over to defendant's vehicle where he observed, inter alia, loose cash wrapped in a shirt on the front seat and loose articles of clothing. In light of all these circumstances, therefore, the Court concludes that at this point in time, before the showup, there was sufficient probable cause to arrest defendant in connection with the First Federal bank robbery. *See Gerstein,* 420 U.S. at 113, 95 S.Ct. 854; *Harple,* 202 F.3d at 197.

However, the defendant was not placed under arrest at that time. Instead, the officers awaited for the results of the showup identification conducted while defendant was still under investigatory detention. When Raynor, the bank employee arrived at the car stop, she was able to positively identify defendant as the individual who had robbed First Federal earlier in the day. With this additional piece of information, BTPD officers decided to place defendant under arrest. In light of the Court's conclusion that probable cause to arrest existed prior to this point in time, this additional information merely enhanced BTPD's probable cause to believe that defendant was involved in the robbery of the First Federal.

### C. The Showup Identification

█ Defendant claims that the showup identification conducted by BTPD in this case was unduly suggestive. Specifically, defendant objects to certain statements made by BTPD officers to Raynor both prior to, and during, the showup itself. Upon careful review of the facts, however, the Court finds no undue suggestiveness on behalf of the police that could call into question the reliability of Raynor's positive identification.

 In the Third Circuit, showup identifications like the one employed in this case are generally permissible, as long as they do not violate due process. *See United States v. Gaines,* 450 F.2d 186, 197 (3d Cir.1971). Due process is violated if there is a "very substantial likelihood of irreparable misidentification." *See Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). To

determine reliability, the Court must examine the identification procedure in light of the "totality of the circumstances." *Government of Virgin Islands v. Riley,* 973 F.2d 224, 228 (3d Cir.1992). Key factors to consider include: (1) the witness' original opportunity to observe a defendant; (2) the degree of attention during the initial observation; (3) the accuracy of the initial description; (4) the witness's degree of certainty when viewing the defendant at the confrontation; and (5) the elapsed time between the crime and the identification procedure. *See Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Reliability is the linchpin for determining the admissibility of identification testimony resulting from a showup under *Biggers.* Applying the *Bigger* factors, the Court concludes that the government has established the reliability of the showup identification in the instant case. To begin with, defendant was identified by Raynor, an eyewitness who was robbed not once, but twice, by defendant. During each of these robberies Raynor had ample opportunity to view defendant as she stood nearby—that is, on the other side of Raynor's teller counter, about three feet away. Further, Raynor was able to provide an accurate description of defendant's physical characteristics only moments after the robbery, including defendant's "paleness of skin." Finally, Sergeant Dowd brought Raynor to the scene of the car stop for the showup only a short while after the crime itself had occurred, thereby ensuring that the events were still fresh in her mind. Although Raynor testified that she was initially "surprised" upon seeing defendant, as soon as defendant raised her head Raynor immediately "realized that it was the person who had robbed the bank."

Moreover, it is important to note that even statements that appear to be suggestive are not necessarily unconstitutional. As this Court has held, "whatever the police actually say to the viewer, it must be apparent to him that [the police] think they have caught the villain.... a showup is by its very nature suggestive, and the

police officer's words ordinarily will not increase the suggestivity already inherent in the format." *United States ex rel. Richardson v. Rundle,* 382 F.Supp. 633, 638 (E.D.Pa.1974) (relying on *Russell v. United States,* 408 F.2d 1280, 1284 (D.C.Cir.1969)).

When viewed in light of this standard, none of the statements made by BTPD to Raynor can be said to have made it apparent to Raynor that the police had caught the person who committed the First Federal bank robbery. Rather, all of the statements in evidence are equivocal in nature, suggesting only that the police had a possible suspect in custody. For example, Sergeant Dowd stated to Raynor that "officers had stopped the car which fit the description," then he asked whether she would be willing to identify the suspect being detained as "either being or not being the bank robber." These comments did not convey any assuredness by Sergeant Dowd that the detainee to whom he referred was necessarily guilty; they were merely statements of fact intended to inform the witness about her responsibility during the showup.

Similarly, another statement made to Raynor—that police were "waiting for a detective to come to the intersection in order for [Raynor] to make a positive identification of the suspect"—was also harmless when viewed in the proper context. Although this statement referred to the showup as involving a "positive identification," it also referred to the detainee as a suspect. More importantly, the statement did not suggest to Raynor in any way that she was required to make a positive identification during the showup. Thus, the Court concludes that none of the statements made to Raynor rose to a level whereby they increased the suggestiveness already inherent in the showup format. They were entirely lawful and did not invalidate the positive identification.

In conclusion, the Court notes that defendant also attacks the showup identification on the ground that it represents taint-

ed "fruit of the poisonous tree"—that is, that it was obtained following an unlawful arrest. However, because the Court concludes that defendant was lawfully under investigatory detention pursuant to a valid *Terry*-stop up until the time the showup was conducted, this argument is meritless and the Court need not address it further.

### D. Validity of the Search Warrant

Defendant challenges the Bucks County search warrant that authorized the search of her tan Lincoln. Defendant's challenge to the warrant is based only on the ground that the warrant was issued, at least in part, on information acquired subsequent to defendant's allegedly unlawful warrantless arrest and on the allegedly improper identification obtained during the showup.

The Court's rulings relating to the *Terry*-stop, the warrantless arrest and the positive identification from the showup moot defendant's challenge to the Bucks County search warrant. First, the Court determined that the defendant was lawfully stopped and then detained in accordance with *Terry*. The Court, further, found that information obtained by BTPD during the ensuing investigatory detention provided ample probable cause for defendant's warrantless arrest. Finally, the Court held that the showup was entirely proper. Because defendant raises no other challenge to the validity of the warrant, the Court concludes that it was not tainted by either an unlawful arrest or an improperly acquired showup identification. Rather, the warrant was validly issued based on probable cause that the tan Lincoln contained evidence of a crime.

## IV. CONCLUSION

For the foregoing reasons, the Court denies the Motion for Suppression of Evidence filed by defendant Richard Patrick McGrath, a/k/a Patricia McGrath.