902 A.2d 177

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CARMELO HERRERA, DEFENDANT–APPELLANT.

Argued January 31, 2006—Decided June 20, 2006.

494

*Alison S. Perrone,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Ms. Perrone and Gregory R. Mueller,* Designated Counsel, on the briefs).

*Linda K. Danielson,* Deputy Attorney General, argued the cause for respondent (*Zulima V. Farber,* Attorney General of New Jersey, attorney).

Justice WALLACE, JR. delivered the opinion of the Court.

The issue presented to the Court is whether the identification procedure used by the police was impermissibly suggestive and resulted in a substantial likelihood of misidentification. Prior to trial, defendant sought to exclude evidence that the victim had identified him at the showup. Following a hearing, the trial court concluded that the out-of-court showup was not impermissibly suggestive and denied defendant's motion. Based largely on the victim's identification testimony, a jury convicted defendant of carjacking and receiving stolen property. The Appellate Division affirmed. We conclude that the showup procedure was impermis-

sibly suggestive, but because the victim's identification of defendant was reliable it was properly admitted at trial. Accordingly, we affirm the Appellate Division's judgment.

## I.

On February 26, 2002, Benjamin Valentin, a sixty-three-year-old private security guard, was assigned to work the 4:00 p.m. to 12:00 a.m. shift in a Hoboken housing complex. He had been working in that area for approximately one month. At the conclusion of his shift, Valentin entered his car and drove to the exit to wait for traffic to pass. While stopped, Valentin observed a man, later identified as defendant Carmelo Herrera, approach on his bicycle before stopping near the front of Valentin's car and yelling something. Valentin did not hear what defendant said to him and lowered his window. Defendant walked to the window and asked Valentin for five dollars. When Valentin replied that he had no money, defendant punched him twice, once in the face and once on the back of the neck, knocking Valentin unconscious. When Valentin regained consciousness, his car was missing and he was bleeding. He walked to a nearby security booth and called the police.

Officer James Miller of the Hoboken Police Department arrived at the scene a short while later. Valentin related the incident and described his assailant as a Hispanic male, about 5'7", with a husky build, and a scar on his face, who was wearing something white and red.[1] Valentin was taken to St. Mary's hospital in Hoboken for treatment.

Meanwhile, Officer Joseph Carr of the Harrison Police Department was called to an accident scene shortly after 1:00 a.m. He

---

[1] At trial Officer Miller testified that Valentin described defendant as a "Hispanic male about five-seven in height, wearing blue jeans, white sneakers, black jacket with red lettering, and he had a short style cut black hair." On cross-examination, Officer Miller stated the "red lettering" was not referenced in his report, but he recalled Valentin saying red lettering.

observed a damaged vehicle in the roadway with the front passenger side tire missing. A man, later identified as defendant, was standing in front of the vehicle. Because defendant appeared intoxicated, Officer Carr arrested and transported him to the police station to administer a breathalyzer test. A search of his person revealed four black belt keepers, which are used by police or security personnel to secure their belts to gun holsters. While preparing his report, Officer Carr received information that the damaged vehicle was stolen from Hoboken.

After the Hoboken police were informed that Valentin's car had been recovered, Lieutenant Edward Mecka contacted the Hudson County Prosecutor's Office to request a "showup" between the victim and the person found with the victim's car. Following that conversation, Lieutenant Mecka and Detective Padilla traveled to St. Mary's Hospital where they informed Valentin of the situation and asked him to go to the police station to identify the man who attacked him. Lieutenant Mecka transported Valentin to the station, where, on arrival, Lieutenant Mecka learned that defendant had been taken to West Hudson Hospital, so the Lieutenant drove Valentin there. As soon as Valentin entered the emergency room of the hospital, he looked around and identified defendant, who was sitting on a hospital bed about six feet away, as the man who had attacked him. The only other persons in the emergency room were two police officers and nurses.

Defendant was indicted for first-degree carjacking, *N.J.S.A.* 2C:15–2, and third-degree receiving stolen property, *N.J.S.A.* 2C:20–7. Prior to trial, he moved to suppress Valentin's out-of-court identification. At the hearing on the motion to suppress, the State offered the testimony of Valentin, Lieutenant Mecka, and Detective Robert Gohde of the Hoboken Police Department. The trial court found that Valentin had seen defendant in the neighborhood prior to the incident and the police did not cause Valentin to misidentify or identify defendant. The court concluded that the out-of-court identification was admissible under *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

At trial, the jury found defendant guilty of both counts. The court merged the convictions and sentenced defendant on the carjacking count to a term of thirty years with an eighty-five percent period of parole ineligibility.

In an unpublished opinion, the Appellate Division rejected defendant's argument that the identification procedure used by the police was impermissibly suggestive and resulted in a substantial likelihood of misidentification, and held that the trial court's findings were supported by credible evidence in the record. However, the panel vacated the sentence and remanded for resentencing because the trial court improperly considered a twenty-year presumptive term for carjacking. We granted defendant's petition for certification. 185 *N.J.* 35, 878 *A.*2d 852 (2005).

## II.

Defendant argues that the manner in which the police conducted the showup identification was impermissibly suggestive and produced a high likelihood of misidentification. He urges that the statements made by the police to Valentin prior to the identification and the manner in which the showup procedure was executed made it impermissibly suggestive. Further, he asserts that the showup procedure lacks trustworthiness because the description of defendant that Valentin provided was inaccurate and because a significant period of time elapsed from the time of the incident to the time of the showup identification.

In his supplemental brief before us, defendant urges this Court to adopt a new standard for determining the admissibility of showup identification evidence. He urges that because showup identifications are by their nature suggestive and more likely to yield false identifications compared to properly conducted lineups and photo arrays, they should be admissible only when the showup is necessary. That is, showup identification evidence should be admitted only if exigent circumstances that require immediate identification are present. Under that approach, defendant argues that a showup conducted without exigent circumstances

would be inadmissible regardless of any indication of reliability. Applying that standard here, defendant concludes that the showup identification testimony should be excluded because of the absence of exigent circumstances to justify the showup.

The State asserts that the identification procedures followed by our courts are long standing and clear; the court must determine whether the identification procedure here was impermissibly suggestive, and, if so, the court must decide whether the procedure nonetheless was reliable. Applying that two-step test, the State maintains that the showup was not impermissibly suggestive, but even if the Court finds otherwise, the identification was reliable.

The State urges this Court to reject defendant's contention that the Court should abandon its adherence to federal constitutional standards in determining the admissibility of identification evidence. The State notes that defendant raised that argument for the first time in his supplemental brief to this Court and did not raise it before the trial court or the Appellate Division. The State contends that, consistent with long-standing precedent from this Court, an issue not raised in the Appellate Division should not be considered unless it involves subject matter jurisdiction or public policy, and neither of those concerns are implicated here. Moreover, the State contends that because defendant supports his new claim with "scientific evidence" that was not presented for scrutiny by the courts below, this Court should not consider it.

### III.

Defendant asks us to abandon the federal constitutional precedent we have followed in deciding the admissibility of identification evidence and to invoke the state constitution to adopt an "exigent circumstances standard." In support of that approach, defendant urges that the fallibility of eyewitness identifications cannot be ignored and that current studies of post-conviction DNA exonerations show that a large majority of those wrongful convictions involved eyewitness error. Therefore, defendant asserts that we

should confine the use of showups to circumstances where they are absolutely necessary and are conducted in a fair manner.

Preliminarily, we note that at least three states have deviated from the United States Supreme Court's precedent on the admission of eyewitness showup identification. In *People v. Adams*, 53 *N.Y.*2d 241, 440 *N.Y.S.*2d 902, 423 *N.E.*2d 379, 382 (1981), the court declined to follow federal precedent and held that evidence of an impermissibly suggestive showup resulting in identifications by several witnesses should have been excluded. The court found, however, that the in-court identifications were independently reliable and the error in the admission of the showup identification evidence was harmless. *Id.* 440 *N.Y.S.*2d 902, 423 *N.E.*2d at 383–84; *see also People v. Riley*, 70 *N.Y.*2d 523, 522 *N.Y.S.*2d 842, 517 *N.E.*2d 520 (1987) (concluding that showup identifications are inadmissible in the absence of exigent circumstances).

In *Commonwealth v. Johnson*, 420 *Mass.* 458, 650 *N.E.*2d 1257, 1259 (1995), the victim identified the defendant in a showup conducted eighteen hours after the robbery occurred. The lower court concluded that the showup was inherently suggestive but reliable based on the circumstances. *Ibid.* The Massachusetts Supreme Judicial Court reversed, holding that its state's constitution requires the exclusion of impermissibly suggestive identification procedures without any secondary analysis of reliability. *Id.* at 1261.

Recently, in *State v. Dubose*, 285 *Wis.*2d 143, 699 *N.W.*2d 582, 597 (2005), the Wisconsin Supreme Court abandoned the federal test. In *Dubose*, the police informed a robbery victim that one of the robbers may have been apprehended. *Id.* at 586. The police took the victim to the police car where the defendant was seated, and the victim identified the defendant. *Ibid.* The trial court found that the identification was reliable and admissible. *Ibid.* The Wisconsin Supreme Court reversed, stating:

[W]e now adopt a different test in Wisconsin regarding the admissibility of showup identifications. We conclude that evidence obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary. A showup will not be necessary,

however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array. [*Id.* at 593–94.]

■ We have no reason to doubt that if defendant had raised these arguments before the trial court and submitted the current research in support of his request for a new standard for determining the admissibility of showup identification, a different record would have been made. The trial court would have received the evidence and made its decision, and the Appellate Division then would have had a full record to review. In that event, the arguments defendant now makes would be properly before us. In the absence of such a record, and in light of our consistent application of federal constitutional precedent in deciding the admissibility of identification evidence, we decline to adopt a new standard under our state constitution. *See State v. Fertig,* 143 *N.J.* 115, 127, 668 *A.*2d 1076 (1996) (noting that "changes in status of hypnotically-refreshed testimony in other jurisdictions, combined with the absence of an adequate record, lead us to decline defendant's belated invitation to reject the [*State v.*] *Hurd* [, 86 *N.J.* 525, 432 *A.*2d 86 (1981) ] guidelines.")

## IV.

We turn now to defendant's alternative argument that the victim's out-of-court identification was both impermissibly suggestive and lacked reliability.

The United States Supreme Court has recognized that in many instances eyewitness identifications have proven unreliable. In *Wade, supra,* 388 *U.S.* at 229, 87 *S.Ct.* at 1933, 18 *L.Ed.*2d at 1158 (1967), Justice Brennan, writing for the Court, stated that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." Justice Brennan recognized that "[a] major factor contributing to mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *Id.* at 228, 87 *S.Ct.* at 1933,

18 *L.Ed.*2d at 1158.[2]   Consequently, the Court held that counsel should be present at pretrial identifications.   *Ibid.*

The same day the Court decided *Wade*, it also held that whether a showup is constitutional under the Fourteenth Amendment is determined by evaluating the totality of the circumstances.   *Stovall v. Denno*, 388 *U.S.* 293, 302, 87 *S.Ct.* 1967, 1973, 18 *L.Ed.*2d 1199, 1206 (1967).   In *Stovall*, the police brought the defendant handcuffed to one of the police officers into the victim's hospital room the day after the defendant allegedly stabbed her.   *Id.* at 295, 87 *S.Ct.* at 1969, 18 *L.Ed.*2d at 1202.   The victim responded affirmatively when the police asked her whether the defendant "was the man."   *Ibid.*   The Court concluded that this confrontation was necessary because: (1) the only person that could exonerate the defendant was in the hospital; (2) the hospital was not far from the courthouse and jail; and (3) no one knew how long the victim might live.   *Id.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206. The Court found that because a station lineup was not possible, the police followed the only feasible procedure.   *Ibid.*   The Court did not find that the identification procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law."   *Id.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206.

Several years later, in *Neil v. Biggers*, 409 *U.S.* 188, 194, 93 *S.Ct.* 375, 380, 34 *L.Ed.*2d 401, 408 (1972), the Supreme Court addressed the validity of a showup identification procedure that occurred seven months after the incident.   In reviewing its prior

---

[2] In 2001, the New Jersey Attorney General disseminated Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures.   In the accompanying memo addressed to law enforcement executives, the Attorney General stated that "[i]n one 1998 study of DNA exoneration cases, ninety percent of the cases analyzed involved one or more mistaken eyewitness identifications."   Letter from Attorney General John J. Farmer, Jr. to All County Prosecutors et al. of Apr. 18, 2001, at 1 (accompanying *Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedure* [hereinafter *Guidelines* ]).   The Attorney General Guidelines are attached as Appendix A to this opinion.

decisions, the Court found it unclear whether "unnecessary suggestiveness alone requires the exclusion of evidence." *Id.* at 198–99, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411. The Court answered the question in the negative and held that the test was "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* at 199, 93 *S.Ct.* at 382, 34 *L.Ed.*2d at 411. After weighing the particular facts of that case, the Court found that there was "no substantial likelihood of misidentification." *Id.* at 201, 93 *S.Ct.* at 383, 34 *L.Ed.*2d at 412.

In *Manson v. Brathwaite,* 432 *U.S.* 98, 99, 97 *S.Ct.* 2243, 2245, 53 *L.Ed.*2d 140, 144 (1977), the Court again was presented with the question whether, apart from any consideration of reliability, a pretrial identification procedure that was impermissibly suggestive should be excluded. The Supreme Court sought to clarify the law because the lower courts had developed two approaches for dealing with such evidence. *Id.* at 110, 97 *S.Ct.* at 2251, 53 *L.Ed.*2d at 151. One approach required exclusion of out-of-court identification evidence only if it were obtained through impermissibly suggestive confrontation procedures without regard to its reliability, while the other approach considered the reliability prong if the out-of-court identification procedure was found to be suggestive. *Ibid.* The Supreme Court concluded that "reliability is the linchpin in determining the admissibility of identification testimony." *Id.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154. The Supreme Court explained that the following factors should be considered in determining reliability:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

[*Ibid.*]

In sum, the Supreme Court's two-step analysis requires the court first to ascertain whether the identification procedure was impermissibly suggestive, and, if so, whether the impermissibly

suggestive procedure was nevertheless reliable. The totality of the circumstances must be considered in weighing the suggestive nature of the identification against the reliability of the identification.

Our Court has consistently followed the United States Supreme Court's analysis in determining the admissibility of out-of-court and in-court identifications. *State v. Madison,* 109 *N.J.* 223, 233, 536 *A.*2d 254 (1988). Until we are convinced that a different approach is required after a proper record has been made in the trial court, we continue to follow the Supreme Court's approach.

V.

We turn now to apply the two-step analysis to the present case. First, we must determine whether the showup procedure at the hospital was impermissibly suggestive.

We start with the commonsense notion that one-on-one showups are inherently suggestive. Those showups by definition are suggestive because the victim can only choose from one person, and, generally, that person is in police custody. Our case law recognizes, however, that standing alone a showup is not so impermissibly suggestive to warrant proceeding to the second step. *See State v. Wilkerson,* 60 *N.J.* 452, 461, 291 *A.*2d 8 (1972) (upholding one-on-one identification by witness ninety minutes after observation). We have permitted on or near-the-scene identifications because "[t]hey are likely to be accurate, taking place, as they do, before memory has faded[ ] [and because] [t]hey facilitate and enhance fast and effective police action and they tend to avoid or minimize inconvenience and embarrassment to the innocent." *Ibid.* We are satisfied, however, that only a little more is required in a showup to tip the scale toward impermissibly suggestive.

Several out-of-state cases are instructive in determining whether the showup in the present case was impermissibly suggestive. In *State v. Williams,* 113 *Ariz.* 14, 545 *P.*2d 938, 939 (1976), the

defendant was apprehended driving the victim's car shortly after he assaulted her. In finding that the identification was impermissibly suggestive, the court noted that the victim was told that she was to observe a man who had been apprehended driving her car. *Id.* at 941.

Similarly, in *State v. Davis,* 61 *Conn.App.* 621, 767 *A.*2d 137, 142 (2001), the suspect was taken to the hospital where the victim was being treated. A police officer interviewing the victim told her, "[w]e got him, we got him.... We had two boys. You got to tell which one, who it is." *Id.* at 143. The court concluded that the showup was impermissibly suggestive because of the comments made by the officer. *Ibid.*

A different result was reached in *United States v. McGrath,* 89 *F.Supp.*2d 569, 581 (E.D.Pa.2000). There, a police officer told a witness en route to the showup location that a car matching the description she had given was found. *Id.* at 574. When they arrived at the scene, the police told the witness they were "waiting for a detective to come to the intersection in order for [her] to make a positive identification of the suspect." *Ibid.* An officer told the witness they "would be taking a person out of the car in front of her," and that she should "look at the person and tell [the detective] whether or not that person was the one who had robbed the bank." *Ibid.* The court found that none of those statements made it apparent to the witness that the police had caught the robber; they merely informed her that a suspect had been apprehended. *Id.* at 581. Thus, the court concluded that the statements by the police did not increase the suggestiveness inherent in a showup, but merely informed the witness of her responsibility during the showup. *Ibid.*

Recently, our Appellate Division found that the witnesses' identification of the defendant seated and handcuffed in the back of the police car was suggestive but that "such suggestive circumstances did not render the identification procedure per se improper and unconstitutional." *State v. Wilson,* 362 *N.J.Super.* 319, 327, 827 *A.*2d 1143 (2003). The panel concluded that the detailed

description by the two witnesses of the defendant and the vehicle involved was corroborated by the motel security videotape, and, therefore, the reliability of the witnesses' identifications were strong. *Ibid.*

█ In the present case, during the pretrial hearing, Valentin testified that while he was being treated at the hospital, a police officer told him they had located his car and that they would take him "to Harrison to identify the person." On cross-examination, Valentin agreed that he told the grand jury the police had said "we found your car, we located your car with somebody in it, we want you to come with us to identify the person." Valentin also testified that while he was at the police station, an officer told him that the individual was now in the hospital and that they would take him to "the hospital to identify [the man]." In addition, Lieutenant Mecka testified that he informed Valentin "that his vehicle was recovered, ... there was an occupant, and that we were going to go out there to look, let him look at the occupant."

We conclude that in combination with the suggestiveness inherent in a showup, the added comments by the police rendered the showup procedures in the out-of-court identification of defendant impermissibly suggestive. Those comments made by the police to the victim were inappropriate because they may have influenced the victim to develop a firmer resolve to identify someone he might otherwise have been uncertain was the culprit.[3] *See, e.g., United States v. Thai*, 29 *F*.3d 785, 810 (2d Cir.), *cert. denied*, 513 *U.S.* 977, 115 *S.Ct.* 456, 130 *L.Ed.*2d 364 (1994).

█ We turn now to determine whether the impermissibly suggestive showup procedure was nevertheless sufficiently reliable to warrant the admissibility of the identification by the victim. We must consider the totality of the circumstances surrounding the identification procedure. Moreover, we have emphasized that

---

[3] The Attorney General's Guideline to "avoid saying anything to the witness that may influence the witness' selection" was not followed. *Guidelines, supra,* at 3.

"the factors listed in *Manson* must be weighed against the corrupting effect of the suggestive procedure." *Madison, supra,* 109 *N.J.* at 240, 536 *A.*2d 254 (citations omitted). The *Manson* factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154.

We consider together the first two *Manson* factors concerning the opportunity of the witness to view the criminal and the witness's degree of attention. Valentin testified that while he was leaving his security job, defendant stopped his bicycle and said something to him. A conversation followed in which defendant asked Valentin for money. When Valentin declined, defendant punched Valentin twice, causing him to lose consciousness. Later, Valentin told the police that during his employment as a security guard, he had observed defendant in the area almost daily, but did not know defendant's name. In finding that the identification procedure was reliable, the trial court underscored that defendant was "not a person who was a stranger to Valentin." We agree that fact is significant, if not controlling. Valentin had previously seen defendant on a daily basis even though he did not know his name, and he had sufficient opportunity to observe defendant during the attack. Although at the time Valentin described defendant to the police he did not indicate he recognized defendant from seeing him in the neighborhood, the trial court credited Valentin's testimony, and we accept that finding.

The next *Manson* factor is the accuracy of Valentin's description of defendant. At the *Wade* hearing, Valentin testified that he told the police that the assailant had very short black hair, a scar on the left side of his face, was a little husky, and wore a white jacket with red on it. When asked on cross-examination if he had told the police the man was wearing a black jacket, Valentin replied he did not know. Valentin also did not recall whether the

man had any facial hair. Officer Gohde testified that he took a statement from Valentin after the showup at the hospital. He stated that Valentin described defendant as having "olive skin, . . . my height, five-six to five-seven . . . wearing blue jeans, sneakers, and had a shaved head, . . . [and] a scar on his face."

Defendant urges that the description Valentin gave to the officer at the scene did not match him because he was wearing a black leather jacket with a circle insignia in red and black at the time of his arrest, not a white jacket as Valentin described. From the record, we are unable to determine whether Valentin provided an accurate description of defendant to the police. Although Officer Miller did not testify at the pretrial hearing, at trial he testified that when he arrived at the scene, Valentin was bleeding and shaken up. Miller stated that Valentin described his assailant as a Hispanic male, about 5'7", wearing blue jeans, white sneakers, and a black jacket with red lettering. The trial court did not make a finding with regard to Valentin's description of defendant but did note that there was an issue "whether or not there was a scar, not a scar on the face, left side, his clothing, but [Valentin] testified he had seen him before . . . and he used to see him almost every day." Consequently, we are unable to evaluate this factor.

The last two *Manson* factors are the "level of certainty demonstrated at the confrontation" and "the time between the crime and the confrontation." The trial court found that Valentin quickly identified defendant while he was sitting on a hospital bed, and we accept that finding. The court, however, made no finding on the length of time between the incident and the showup except to say that "some time had passed."

Apart from the trial court's findings, our review of the record satisfies us that the showup took place within a reasonable time. The offense occurred shortly after 12:00 a.m. Following apprehension of defendant at the scene of the accident, the police sought and received authorization from an assistant prosecutor to conduct a showup around 2:50 a.m. Subsequently, the police went

to St. Mary's Hospital in Hoboken to have Valentin accompany them back to the Harrison Police Station for the showup. Upon learning defendant had been taken to West Hudson Hospital, the police transported Valentin to the emergency room where he immediately identified defendant. Based on those facts, the State asserts that the identification procedure occurred within a reasonable time. We agree. We conclude that an approximate five-hour period between the incident and the identification does not subvert the reliability of the identification procedure.

Weighing the above factors in favor of reliability against the corrupting effects of the impermissibly suggestive procedure, we are satisfied that the identification procedure was reliable and did not result in a substantial likelihood of misidentification. In particular, the evidence that Valentin had seen defendant on a daily basis in the month prior to the incident is strong evidence in support of reliability of Valentin's identification of defendant. Based on the totality of the circumstances, we conclude that the trial court properly admitted Valentin's out-of-court identification of defendant.

## VI.

Lastly, we note that other jurisdictions have expanded upon and refined the *Manson* factors in evaluating reliability. For example, the Utah Supreme Court replaced the *Manson* factor of "the level of certainty demonstrated by the witness at the confrontation" with "whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion." *State v. Ramirez*, 817 P.2d 774, 781 (1991). That court also considered "the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly." *Ibid.* Under the latter factor, the Utah court included "whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's." *Ibid.*

In *State v. Cromedy,* 158 *N.J.* 112, 126–33, 727 *A.*2d 457 (1999), we required a cross-racial identification jury charge and relied in part on the Utah Supreme Court's view expressed in *State v. Long,* 721 *P.*2d 483 (1986). Subsequently, our model jury charge was amended to include a cross-racial identification provision when appropriate.

To be sure, our model jury charge on out-of-court identification instructs the jury to consider "[a]ny other factor based on the evidence or lack of evidence in the case which you consider relevant to your determination whether the out-of-court identification was reliable." *Model Jury Charges (Criminal),* "Out–of–Court Identification" (1999). Nevertheless, we note that the charge on identification has not been amended since 1999. Some members of the Court agree with the Utah approach that the jury charge on identification should expressly address whether the identification was the product of suggestion. Accordingly, we request that the Criminal Practice Committee and the Model Jury Charge Committee consider whether our charge on identification should expressly include a reference to suggestibility as well as any other factor the Committees deem appropriate.

## VI.

The judgment of the Appellate Division is affirmed.

## APPENDIX A

*State of New Jersey*

DEPARTMENT OF LAW AND PUBLIC SAFETY

OFFICE OF THE ATTORNEY GENERAL

PO BOX 080

TRENTON, NJ 08625-008

(609) 292-4925

DONALD T. DIFRANCESCO

*Acting Governor*

JOHN J. FARMER, JR.

*Attorney General*

April 18, 2001

**TO: ALL COUNTY PROSECUTORS**

**COL. CARSON J. DUNBAR, JR., SUPERINTENDENT, NJSP**

**ALL POLICE CHIEFS**

**ALL LAW ENFORCEMENT CHIEF EXECUTIVES**

**Re: Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures**

It is axiomatic that eyewitness identification evidence is often crucial in identifying perpetrators and exonerating the innocent. However, recent cases, in which DNA evidence has been utilized to exonerate individuals convicted almost exclusively on the basis of eyewitness identifications, demonstrate that this evidence is not fool-proof. In one 1998 study of DNA exoneration cases, ninety percent of the cases analyzed involved one or more mistaken eyewitness identifications.[1] The attached *Attorney General*

---

[1] Of 40 cases analyzed, 36 of the subsequent exonerations involved convictions that were based on one or more erroneous eyewitness identifications. Wells,

*Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures*, which incorporate more than 20 years of scientific research on memory and interview techniques, will improve the eyewitness identification process in New Jersey to ensure that the criminal justice system will fairly and effectively elicit accurate and reliable eyewitness evidence. These Guidelines apply to both adult and juvenile cases. With these Guidelines, New Jersey will become the first state in the Nation to officially adopt the recommendations issued by the United States Department of Justice in its *Eyewitness Evidence Guidelines.*

Components of these Guidelines are already being utilized by many of our law enforcement officers, such as instructing witnesses prior to lineups or photo identifications that a perpetrator may not be among those in a lineup or photo spread and, therefore, the witness should not feel compelled to make an identification. Two procedural recommendations contained in these Guidelines are particularly significant and will represent the primary area of change for most law enforcement agencies. The first advises agencies to utilize, whenever practical, someone other than the primary investigator assigned to a case to conduct both photo and live lineup identifications. The individual conducting the photo or live lineup identification should not know the identity of the actual suspect. This provision of the Guidelines is not intended to question the expertise, integrity or dedication of primary investigators working their cases. Rather, it acknowledges years of research which concludes that even when utilizing precautions to avoid any inadvertent body signals or cues to witnesses, these gestures do occur when the identity of the actual suspect is known to the individual conducting the identification procedure. This provision of the Guidelines eliminates uninten-

G.L., M.Small, S.D. Penrod, R.S. Malpass, S.M. Fulero, and C.A.E. Brimacombe. "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads." *Law and Human Behavior,* Vol. 22, No. 6.1998.

tional verbal and body cues which may adversely impact a witness' ability to make a reliable identification.

I recognize that this is a significant change from current practice that will not be possible or practical in every case. When it is not possible in a given case to conduct a lineup or photo array with an independent investigator, the primary investigator must exercise extreme caution to avoid any inadvertent signaling to a witness of a "correct" response which may provide a witness with a false sense of confidence if they have made an erroneous identification. Studies have established that the confidence level that witnesses demonstrate regarding their identifications is the primary determinant of whether jurors accept identifications as accurate and reliable.[2] Technological tools, such as computer programs that can run photo lineups and record witness identifications independent of the presence of an investigator, as well as departmental training of a broader range of agency personnel to conduct lineups and photo identifications may also assist agencies and departments with staff and budget constraints in implementing this recommendation.

The Guidelines also recommend that, when possible, "sequential lineups" should be utilized for both photo and live lineup identifications. "Sequential lineups" are conducted by displaying one photo or one person at a time to the witness. Scientific studies have also proven that witnesses have a tendency to compare one member of a lineup to another, making relative judgements about which individual looks most like the perpetrator. This relative judgement process explains why witnesses sometimes mistakenly pick someone out of a lineup when the actual perpetrator is not even present. Showing a witness one photo or one person at a time, rather than simultaneously, permits the witness to make an identi-

---

[2] Cutler, B.L., and S.D. Penrod. "Mistaken Identification: The Eyewitness, Psychology, and the Law," New York: Cambridge University Press, 1995; Wells, G.L. and Bradfield, A.L., "Distortions in Eyewitness Recollections: Can the Post-identification Feedback Effect be Moderated?", *Psychological Science*, 1999.

fication based on each person's appearance before viewing another photo or lineup member. Scientific data has illustrated that this method produces a lower rate of mistaken identifications.[3]  If use of this method is not possible in a given case or department, the Guidelines also provide recommendations for conducting simultaneous photo and live lineup identifications.

Although the Guidelines are fairly self-explanatory, their implementation will require a steep learning curve. To that end, training will be conducted. To accommodate appropriate training, the Guidelines will become effective within 180 days of the date of this letter. However, I would encourage you to implement the Guidelines sooner, if possible. I am requesting that each County Prosecutor designate key law enforcement personnel and police training coordinators to work with the Division of Criminal Justice to train your staff as well as the local law enforcement agencies within your jurisdiction.

While it is clear that current eyewitness identification procedures fully comport with federal and state constitutional requirements, the adoption of these Guidelines will enhance the accuracy and reliability of eyewitness identifications and will strengthen prosecutions in cases that rely heavily, or solely, on eyewitness evidence. The issuance of these Guidelines should in no way be used to imply that identifications made without these procedures are inadmissible or otherwise in error. Your cooperation is appreciated as all members of our law enforcement community strive to implement these procedures. Should you have any questions regarding the implementation of these Guidelines, please contact the Division of Criminal Justice, Prosecutors & Police Bureau, at 609–984–2814.

Very Truly Yours,
John J. Farmer, Jr.
Attorney General

---

3 Wells, G.L., M.Small, S.D. Penrod, R.S. Malpass, S.M. Fulero, and C.A.E. Brimacombe. "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads." *Law and Human Behavior*, Vol. 22, No. 6.1998.

Attachment

cc:  Director Kathryn Flicker

   Chief of Staff Debra L. Stone

   Deputy Director Wayne S. Fisher, Ph.D.

   Deputy Director Anthony J. Zarrillo, Jr.

   Chief State Investigator John A. Cocklin

   SDAG Charles M. Grinnell, Acting Chief, Prosecutors & Police Bureau

## ATTORNEY GENERAL GUIDELINES FOR PREPARING AND CONDUCTING PHOTO AND LIVE LINEUP IDENTIFICATION PROCEDURES

### PREAMBLE

While it is clear that current eyewitness identification procedures fully comport with federal and state constitutional requirements, that does not mean that these procedures cannot be improved upon. Both case law and recent studies have called into question the accuracy of some eyewitness identifications. The Attorney General, recognizing that his primary duty is to ensure that justice is done and the criminal justice system is fairly administered, is therefore promulgating these guidelines as "best practices" to ensure that identification procedures in this state minimize the chance of misidentification of a suspect.

### I.  COMPOSING THE PHOTO OR LIVE LINEUP

The following procedures will result in the composition of a photo or live lineup in which a suspect does not unduly stand out. An identification obtained through a lineup composed in this manner should minimize any risk of misidentification and have stronger evidentiary value than one obtained without these procedures.

A. In order to ensure that inadvertent verbal cues or body language do not impact on a witness, whenever practical, considering the time of day, day of the week, and other personnel conditions within the agency or department, the person conducting the photo or live lineup identification procedure should be someone other than the primary investigator assigned to the case. The Attorney General recognizes that in many departments, depending upon the size and other assignments of personnel, this may be impossible in a given case. In those cases where the primary investigating officer conducts the photo or live lineup identification procedure, he or she should be careful to avoid inadvertent signaling to the witness of the "correct" response.

B. The witness should be instructed prior to the photo or live lineup identification procedure that the perpetrator may not be among those in the photo array or live lineup and, therefore, they should not feel compelled to make an identification.

C. When possible, photo or live lineup identification procedures should be conducted sequentially, *i.e.,* showing one photo or one person at a time to the witness, rather than simultaneously.

D. In composing a photo or live lineup, the person administering the identification procedure should ensure that the lineup is comprised in such a manner that the suspect does not unduly stand out. However, complete uniformity of features is not required.

E. **Photo Lineup.** In composing a photo lineup, the lineup administrator or investigator should:

1. Include only one suspect in each identification procedure.

2. Select fillers (nonsuspects) who generally fit the witness' description of the perpetrator. When there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.

3. Select a photo that resembles the suspect's description or appearance at the time of the incident if multiple photos of the suspect are reasonably available to the investigator.

4. Include a **minimum** of five fillers (nonsuspects) per identification procedure.

5. Consider placing the suspect in different positions in each lineup when conducting more than one lineup for a case due to multiple witnesses.

6. Avoid reusing fillers in lineups shown to the same witness when showing a new suspect.

7. Ensure that no writings or information concerning previous arrest(s) will be visible to the witness.

8. View the array, once completed, to ensure that the suspect does not unduly stand out.

9. Preserve the presentation order of the photo lineup. In addition, the photos themselves should be preserved in their original condition.

F. **Live Lineups.** In composing a live lineup, the lineup administrator or investigator should:

1. Include only one suspect in each identification procedure.

2. Select fillers (nonsuspects) who generally fit the witness' description of the perpetrator. When there is a limited or inadequate description of the perpetrator provided by the witness, or when the description of the perpetrator differs significantly from the appearance of the suspect, fillers should resemble the suspect in significant features.

3. Consider placing the suspect in different positions in each lineup when conducting more than one lineup for a case due to multiple witnesses.

4. Include a **minimum** of four fillers (nonsuspects) per identification procedure.

5. Avoid reusing fillers in lineups shown to the same witness when showing a new suspect.

## II CONDUCTING THE IDENTIFICATION PROCEDURE

The identification procedure should be conducted in a manner that promotes the accuracy, reliability, fairness and objectivity of the witness' identification. These steps are designed to ensure the accuracy of identification or nonidentification decisions.

A. **Simultaneous Photo Lineup:** When presenting a simultaneous photo lineup, the lineup administrator or investigator should:

1. Provide viewing instructions to the witness as outlined in subsection I B, above.

2. Confirm that the witness understands the nature of the lineup procedure.

3. Avoid saying anything to the witness that may influence the witness' selection.

4. If an identification is made, avoid reporting to the witness any information regarding the individual he or she has selected prior to obtaining the witness' statement of certainty.

5. Record any identification results and witness' statement of certainty as outlined in subsection II E, "Recording Identification Results."

6. Document in writing the lineup procedure, including:

   a. Identification information and sources of all photos used.

   b. Names of all persons present at the photo lineup.

   c. Date and time of the identification procedure.

7. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

B. **Sequential Photo Lineup:** When presenting a sequential photo lineup, the lineup administrator or investigator should:

1. Provide viewing instructions to the witness as outlined in subsection I B, above.
2. Provide the following **additional** viewing instructions to the witness:
    a. Individual photographs will be viewed **one at a time**.
    b. The photos are in random order.
    c. Take as much time as needed in making a decision about each photo before moving to the next one.
    d. All photos will be shown, even if an identification is made prior to viewing all photos; **or** the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).
3. Confirm that the witness understands the nature of the sequential procedure.
4. Present each photo to the witness separately, in a previously determined order, removing those previously shown.
5. Avoid saying anything to the witness that may influence the witness' selection.
6. If an identification is made, avoid reporting to the witness any information regarding the individual he or she has selected prior to obtaining the witness' statement of certainty.
7. Record any identification results and witness' statement of certainty as outlined in subsection II E, "Recording Identification Results."
8. Document in writing the lineup procedure, including:
    a. Identification information and sources of all photos used.
    b. Names of all persons present at the photo lineup.
    c. Date and time of the identification procedure.
9. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

C. **Simultaneous Live Lineup:** When presenting a simultaneous live lineup, the lineup administrator or investigator should:
1. Provide viewing instructions to the witness as outlined in subsection I B, above.
2. Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.
3. Ensure that any identification actions (*e.g.*, speaking, moving, etc.) are performed by all members of the lineup.
4. Avoid saying anything to the witness that may influence the witness' selection.
5. If an identification is made, avoid reporting to the witness any information regarding the individual he or she has selected prior to obtaining the witness' statement of certainty.
6. Record any identification results and witness' statement of certainty as outlined in subsection II E, "Recording Identification Results."

7. Document in writing the lineup procedure, including:
   a. Identification information of lineup participants.
   b. Names of all persons present at the lineup.
   c. Date and time of the identification procedure.
8. Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly.
9. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

D. **Sequential Live Lineup:** When presenting a sequential live lineup, the lineup administrator or investigator should:

1. Provide viewing instructions to the witness as outlined in subsection I B, above.
2. Provide the following **additional** viewing instructions to the witness:
   a. Individuals will be viewed **one at a time.**
   b. The individuals will be presented in random order.
   c. Take as much time as needed in making a decision about each individual before moving to the next one.
   d. If the person who committed the crime is present, identify him or her.
   e. All individuals will be presented, even if an identification is made prior to viewing all the individuals; **or** the procedure will be stopped at the point of an identification (consistent with jurisdictional/departmental procedures).
3. Begin with all lineup participants out of the view of the witness.
4. Instruct all those present at the lineup not to suggest in any way the position or identity of the suspect in the lineup.
5. Present each individual to the witness separately, in a previously determined order, removing those previously shown.
6. Ensure that any identification action (*e.g.*, speaking, moving, etc.) are performed by all members of the lineup.
7. Avoid saying anything to the witness that may influence the witness' selection.
8. If an identification is made, avoid reporting to the witness any information regarding the individual he or she has selected prior to obtaining the witness' statement of certainty.
9. Record any identification results and witness' statement of certainty as outlined in subsection II E, "Recording Identification Results."
10. Document in writing the lineup procedure, including:
    a. Identification information of lineup participants.
    b. Names of all persons present at the lineup.
    c. Date and time the identification procedure was conducted.

11. Document the lineup by photo or video. This documentation should be of a quality that represents the lineup clearly and fairly. Photo documentation can either depict the group or each individual.

12. Instruct the witness not to discuss the identification procedure or its results with other witnesses involved in the case and discourage contact with the media.

### E. Recording Identification Results

When conducting an identification procedure, the lineup administrator or investigator shall preserve the outcome of the procedure by documenting any identification or nonidentification results obtained from the witness. Preparing a complete and accurate record of the outcome of the identification procedure is crucial. This record can be a critical document in the investigation and any subsequent court proceedings. When conducting an identification procedure, the lineup administrator or investigator should:

1. Record both identification and nonidentification results in writing, including the witness' own words regarding how sure he or she is.

2. Ensure that the results are signed and dated by the witness.

3. Ensure that no materials indicating previous identification results are visible to the witness.

4. Ensure that the witness does not write on or mark any materials that will be used in other identification procedures.

**Dated:** April 18, 2001, effective no later than the 180th day from this date.

Justice ALBIN, dissenting.

Misidentification is the single greatest source of error leading to wrongful convictions in this country.[1] In recent years, capital convictions have been overturned in a number of jurisdictions because DNA evidence has irrefutably established that the defendants condemned to death were wrongly convicted based on mistaken identification testimony. Fair identification procedures cannot fully ensure that mistaken identifications will not occur, for any ultimate judgment that relies on human perception and memory is fraught with the potential for error. Highly suggestive

---

[1] *See, e.g., State v. Dubose,* 285 *Wis.*2d 143, 699 *N.W.*2d 582, 592 (2005) (recognizing that "research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined").

identification procedures, however, exponentially increase the possibility of misidentifications and unjust convictions.

With those simple truths in mind, I cannot join with my colleagues in sanctioning the showup identification procedure in this case in which the police specifically cued the witness to identify defendant. That procedure was so patently unfair and unnecessarily suggestive that it undermines any confidence in the reliability of the identification itself. I fear that the Court's approval of the admissibility of the identification in this case will signal that virtually any identification procedure in this State, however loaded and unfair, will pass constitutional muster. The unintended consequence of today's decision will be the admission of more highly suspect identifications leading to more wrongful convictions.

Under the present constitutional standard followed by the majority, a suggestive identification procedure—however unnecessary—will not lead to the exclusion of an identification if a court finds the identification otherwise reliable. To minimize the number of wrongful convictions in our system of justice, the time has come for this Court to set new standards that prohibit highly suggestive identification procedures, such as the showing of a single suspect to a witness, when they are unnecessary—that is, when they are not warranted by any exigency. Nevertheless, even under current law, the identification of defendant should have been excluded because the showup procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. I therefore respectfully dissent.

## I.

The facts of this case present a compelling picture of impermissibly suggestive identification techniques that corrupted the reliability of the identification. Having completed his shift work as a security guard, sixty-two-year-old Benjamin Valentin was seated in his car shortly after 12:00 a.m. when he was approached by a

person on a bicycle. That person knocked Valentin unconscious, pulled Valentin from his car, and then stole the car.

When the police arrived on the scene, the bloodied victim gave a description of his assailant. There were a number of discrepancies between that description and the way defendant Carmelo Herrera looked and was dressed that evening. Valentin described his assailant as a male with short black hair; Herrera had a shaved head. Valentin stated that his assailant was wearing white sneakers; Herrera, however, was wearing red and gray boots. Valentin did not mention that his assailant had facial hair; Herrera was sporting a goatee. Valentin also did not convey that his assailant had a facial scar; Herrera had a noticeable scar on his left cheek.[2]

From the scene, paramedics transported Valentin to St. Mary's Hospital, where he was treated for his injuries. Valentin testified that at the hospital an officer told him that the police had recovered his car and had "arrested somebody in the car." Valentin was then told that he would be taken to headquarters for the purpose of identifying that person.

When they arrived at Harrison police headquarters, the suspect—Herrera—was not there. In fact, Herrera was at West Hudson Hospital. Although the police obtained photographs of Herrera at headquarters, for some inexplicable reason they did not put together a photographic array and ask Valentin whether he could identify his assailant from the array. Instead, the police told Valentin, "We're going to the hospital to do an identification." Sometime between 3:00 a.m. and 4:00 a.m., the police took Valentin to West Hudson Hospital and ushered him into an emergency room, where Herrera was lying on a gurney surrounded by police officers and nurses. The police said to Valentin, "[C]ome here,

---

[2] At the *Wade* hearing, Valentin testified that he told the police that his assailant had a scar on his face. According to the police, however, Valentin first mentioned that his assailant had a facial scar after he had seen and identified Herrera.

sir, you can identify whoever hit you." Unsurprisingly, Valentin, who had been told earlier that he would be shown the man found in his car, identified Herrera, the only patient in the room.

## II.

I agree with the majority that the identification procedures were impermissibly suggestive. I disagree with the majority's conclusion that the suggestive identification procedures did not give rise to a very substantial likelihood of irreparable misidentification. First, Herrera was under arrest at the hospital. Because he was not about to be released and the police had photographs of him which could have been placed in an array and shown to Valentin, there was no need for a showup. Second, it was inexcusable for the police to tell Valentin that the suspect he would be shown was found in his car. Besides the fact that defendant was found standing outside the car, it was entirely irrelevant to whether Valentin could identify his assailant. The subliminal message conveyed by the police was, "We found the man who attacked you." Even when a photographic lineup is shown to a witness, the Attorney General's Guidelines instruct police officers not to cue the witness in any way towards a particular photograph.[3] Here, in a staged showup, the police cued Valentin to identify the one civilian shown to him in a hospital room. It is difficult to imagine a more unnecessarily suggestive identification procedure, a procedure more likely to fatally distort the memory of a witness.

---

[3] The Attorney General's Guidelines require that photographs be shown not in a lineup form, but sequentially, whenever possible. *See Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* (Apr. 18, 2001). The Attorney General's Office has taken commendable action to address the need to make identification procedures fairer and thus more reliable. This Court, however, has the ultimate responsibility to ensure that identifications introduced into evidence are the product of fundamentally fair procedures.

Under those circumstances, whatever certainty Valentin expressed in identifying Herrera is suspect. It bears mentioning that whether a witness makes a correct identification or a mistaken identification, the witness invariably is certain about his or her selection.[4] In light of the impermissibly suggestive techniques, it is impossible to credit the reliability of the identification in this case. Valentin caught only a brief glimpse of his attacker, he was knocked unconscious, and he gave a description of his attacker that did not conform in significant ways to the appearance or dress of Herrera. Moreover, only after Valentin was told that the person he would be shown was found in his car did he say that he knew his assailant.

## III.

New Jersey has "consistently followed the [United States] Supreme Court's analysis on whether out-of-court and in-court identifications are admissible into evidence." *State v. Madison,* 109 *N.J.* 223, 233, 536 *A.*2d 254 (1988). That analysis requires that courts set aside convictions based on eyewitness identification only if the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968). Within that construct, "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977). Ultimately, a court must determine "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers,* 409 *U.S.* 188,

---

4 *See, e.g.,* Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony: Civil and Criminal* 141 (3d ed. 1997) ("Research suggests that witness certainty sometimes has little or no correlation with accuracy."); 2 Wayne R. LaFave et al., *Criminal Procedure* § 7.4(c), at 675 (2d ed. 1999) ("The level of certainty demonstrated at the confrontation by the witness ... is not a valid indicator of the accuracy of the recollection." (internal quotation marks omitted)).

199, 93 *S.Ct.* 375, 382, 34 *L.Ed.*2d 401, 411 (1972). Because the primary focus of the analysis is not on whether the identification procedure was unnecessarily suggestive, but on whether the identification was reliable, "the failure of police to follow the line-up procedure will not, of itself, render the pretrial identification invalid as being unduly suggestive or totally unreliable." *See State v. Thomas*, 107 *N.J.Super.* 128, 132, 257 *A.*2d 377 (App.Div. 1969).

## A.

Commonsense and a multitude of social science studies tell us that "the one-person 'showup,' in which the eyewitness confronts a single suspect, is particularly conducive to misidentifications." [5] Charles A. Pulaski, *Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection*, 26 *Stan. L.Rev.* 1097, 1104 (1974). Indeed, according to one commentator, the showup "constitutes the most grossly suggestive identification procedure now or ever used by the police." Patrick M. Wall, *Eye–Witness Identification in Criminal Cases* 28 (1965). In *United*

---

[5] Psychological researchers who have studied the effectiveness of one-person, as compared to multi-person, lineups have concluded that one-person lineups should be "avoided" because "they increase the likelihood of false identifications." Willem A. Wagenaar & Nancy Veefkind, *Comparison of One–Person and Many–Person Lineups: A Warning Against Unsafe Practices, in Psychology and Law* 275, 283 (Friedrich Losel et al. eds., 1992). "Any hope that showups might be a superior technique," either "because they force the use of absolute judgment or because they eliminate the possibility of multiple selections," has been rejected by researchers as "misguided." R.C.L. Lindsay et al., *Simultaneous Lineups, Sequential Lineups, and Showups: Eyewitness Identification Decisions of Adults and Children*, 21 *Law & Hum. Behav.* 391, 398 (1997). Their data "have demonstrated the showup to be a dangerous procedure." *Id.* at 402; *see also* Wagenaar & Veefkind, *supra*, at 284 (proclaiming that "[u]sage of one-person lineups should ... be considered as an unsafe practice"); Richard Gonzalez, Phoebe C. Ellsworth & Maceo Pembroke, *Response Biases in Lineups and Showups*, 64 *J. Personality & Soc. Psychol.* 525, 525 (1993) (noting that "[i]n a recent survey of psychological experts in the field of eyewitness testimony, 78% of the sample agreed that 'the use of a one-person showup instead of a full lineup increases the risk of misidentification,' and 65% felt that the evidence for [that] proposition was generally reliable or very reliable").

*States v. Wade,* the Court found it difficult "to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by the police." 388 *U.S.* 218, 234, 87 *S.Ct.* 1926, 1936, 18 *L.Ed.*2d 1149, 1161 (1967). Thus, "[t]he practice of showing suspects singly to persons for the purposes of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno,* 388 *U.S.* 293, 302, 87 *S.Ct.* 1967, 1972, 18 *L.Ed.*2d 1199, 1206 (1967); *see also* Lawrence Taylor, J.D., *Eyewitness Identification* 102 (1982) (commenting that "experts in the field of law and police methods have been uniform in their condemnations of the showup procedure").

Despite the widespread condemnation of the unnecessary use of showups, the police continue to employ the technique in unwarranted circumstances. *See* Steven P. Grossman, *Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet Its Own Criteria,* 11 *U. Balt. L.Rev.* 53, 59–60 (1981). The unnecessary use of the showup is still in vogue because the current standard followed by the United States Supreme Court and this Court "provide[s] the police with a fairly clear signal that absent extremely aggravating circumstances, the one-on-one presentation of suspects to witnesses will result in no suppression." *See id.* at 60. Case law indicates that even "flagrant[ly] suggestive conduct might produce no negative consequences for the police." *See id.* at 59. Thus it is clear that the present standard does not impose on the police a disincentive for using highly suggestive identification procedures when non-suggestive procedures are readily available.

In light of the increased likelihood of misidentifications by the use of showups, this Court should not be timid about barring that highly suggestive procedure in circumstances when its use is not warranted. *See* Benjamin E. Rosenberg, *Rethinking the Right to Due Process in Connection with Pretrial Identification Procedures: An Analysis and a Proposal,* 79 *Ky. L.J.* 259, 276 (1991) (noting that "[s]ince the Supreme Court has held that the sole value underlying the right [to due process] is reliability, the

critically important interest of procedural fairness in pretrial identification procedures is unprotected"); Wallace W. Sherwood, *The Erosion of Constitutional Safeguards in the Area of Eyewitness Identification,* 30 *How. L.J.* 439, 457 (1987) (stating that "*Biggers* approach allows courts to make a determination of the defendant's guilt and disregard completely the realities of eyewitness identification"); Jessica Lee, Note, *No Exigency, No Consent: Protecting Innocent Suspects from the Consequences of Non–Exigent Show-ups,* 36 *Colum. Hum. Rts. L.Rev.* 755, 756–57 (2005) (remarking that "standards articulated by the Supreme Court to address th[e] risks [of mistaken identifications] have not been sufficient to remedy the problems accompanying non-exigent show-ups"); Note, *Pretrial Identification Procedures—Wade to Gilbert to Stovall: Lower Courts Bobble the Ball,* 55 *Minn. L.Rev.* 779, 790 (1971) (stating that United States Supreme Court's decisions "protect only the due process rights of those suspects who, in the court's opinion, are innocent.... [N]o matter how suggestive the confrontation might have been, the suspect's right to due process goes unprotected.").

If a suspect has been in custody for days and a photographic or in-person lineup is feasible, it is inexcusable for the police to use a procedure pregnant with the possibility of error. On the other hand, the showup still has a place in appropriate cases, as evidenced by the facts in *Stovall v. Denno, supra.* In that case, a stabbing victim was hospitalized, and it was uncertain whether or how long she might live. 388 *U.S.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206. Two days after the stabbing, the defendant was taken into custody and brought to the victim's hospital room. *Id.* at 295, 87 *S.Ct.* at 1969, 18 *L.Ed.*2d at 1202. The Court noted that "the only person in the world who could possibly exonerate [the defendant]" was the victim. *Id.* at 302, 87 *S.Ct.* at 1972, 18 *L.Ed.*2d at 1206 (internal quotation marks omitted). "Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the victim] could not visit the jail, the police followed the only feasible procedure

and took [the defendant] to the hospital room." *Ibid.* (internal quotation marks omitted).

## B.

To a person whose fate depends on the accuracy of an identification, it is fundamentally unfair for the police to unnecessarily employ a technique that maximizes the potential for error. The case before us presents the perfect opportunity to review this Court's current standards governing unnecessarily suggestive identification procedures.

It is time for this Court to announce that the use of unnecessarily suggestive identification procedures violates the due process guarantees of Article I, Paragraph 1 of the New Jersey Constitution. *See State v. Maisonet,* 166 *N.J.* 9, 21, 763 *A.2d* 1254 (2001) ("When a defendant is inexplicably subjected to arbitrary, unfair, and egregious action at the hands of the State, principles of fundamental fairness require our intervention."). By doing so, we will be in step with a number of other states that have rejected the United States Supreme Court's approach and relied on their own state constitutions to ensure that unnecessarily suggestive identification procedures are not used by the police. *See Commonwealth v. Botelho,* 369 *Mass.* 860, 343 *N.E.2d* 876, 880 (1976) (barring prosecution from introducing "confrontation that was unnecessarily suggestive"); *State v. Leclair,* 118 *N.H.* 214, 385 *A.2d* 831, 833 (1978) (finding that "[t]here is no legitimate reason for the police to use unnecessarily suggestive identification procedures" and condemning use of one-man showups "absent exigent circumstances"); *People v. Riley,* 70 *N.Y.2d* 523, 522 *N.Y.S.2d* 842, 517 *N.E.2d* 520, 523 (1987) (declaring showups "permissible if exigent circumstances require immediate identification, or if the suspects are captured at or near the crime scene and can be viewed by the witness immediately" (citation omitted)); *State v. Dubose,* 285 *Wis.2d* 143, 699 *N.W.2d* 582, 584 (2005) (holding that "evidence obtained from [an out-of-court] showup will not be admissible unless, based on the totality of the circumstances, the showup was

necessary"). In one form or another, those jurisdictions all have found that by overly focusing on the reliability of the identification itself, the federal approach has inadequately protected against "unnecessarily suggestive identification procedures, ... mistaken identifications and, ultimately, wrongful convictions." *See Commonwealth v. Johnson,* 420 *Mass.* 458, 650 *N.E.*2d 1257, 1262 (1995); *see also Leclair, supra,* 385 *A.*2d at 833; *People v. Adams,* 53 *N.Y.*2d 241, 440 *N.Y.S.*2d 902, 423 *N.E.*2d 379, 383–84 (1981); *Dubose, supra,* 699 *N.W.*2d at 591–92.

Those jurisdictions recognize what Justices Marshall and Brennan understood in *Manson v. Brathwaite, supra*:

[I]mpermissibly suggestive identifications are not merely worthless law enforcement tools. They pose a grave threat to society at large in a more direct way than most governmental disobedience of the law. For if the police and the public erroneously conclude, on the basis of an unnecessarily suggestive confrontation, that the right man has been caught and convicted, the real outlaw must still remain at large. Law enforcement has failed in its primary function and has left society unprotected from the depredations of an active criminal.

[432 *U.S.* at 127, 97 *S.Ct.* at 2259–60, 53 *L.Ed.*2d at 162 (Marshall, J., dissenting) (citation omitted).]

Like those jurisdictions, I would preclude the introduction into evidence of an identification that is the product of an unnecessarily suggestive identification procedure. *See id.* at 127, 97 *S.Ct.* at 2259, 53 *L.Ed.*2d at 162 ("[E]xclusion both protects the integrity of the truth-seeking function of the trial and discourages police use of needlessly inaccurate and ineffective investigatory methods."). In this case, the police essentially conveyed to the victim that the suspect about to be displayed to him in a showup had stolen his car. That procedure guaranteed the identification of defendant, not a fair selection process.

I am mindful that police officers act under the stress of fast moving and developing events and that it is easy to second-guess their judgment from the safe distance of hindsight. Courts should resist the temptation to do so. In determining whether an identification procedure was unnecessary, I would require that the defendant bear the burden of proving by a preponderance of evidence that another less suggestive procedure would have been

employed by a reasonable police officer faced with similar circumstances.

## IV.

The majority claims that the issue of whether we should adopt a new standard barring the use of unnecessarily suggestive identification procedures is not properly before us. I disagree. The parties have briefed and argued before this Court that precise point. This Court has the power to exercise "such original jurisdiction as is necessary to the complete determination of any matter on review." *R.* 2:10–5. Although it is true that defendant did not ask the lower courts to overrule this Court's jurisprudence on identification procedures, we would hardly expect a lower court to do so. Only this Court has the authority to overturn its own precedents. When this Court has spoken, change must come from the Court itself. The issue is before us; we should not avert our eyes.

## V.

I believe that defendant's due process rights under both the Federal and State Constitutions were violated by the admission of the identification in this case. I therefore would reverse the judgment of the Appellate Division and order a new trial at which the identification evidence would be excluded. I also would hold that Article I, Paragraph 1 of our State Constitution does not allow for the admission into evidence of identifications made through unnecessarily suggestive procedures. For those reasons, I respectfully dissent.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices LaVECCHIA, ZAZZALI, WALLACE and RIVERA–SOTO—5.

*For reversal*—Justices LONG and ALBIN—2.